PROVIDED TO AVON PARK
CORRECTIONAL INSTITUTION
On _____ FOR MAILING
BY _____

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**KIM BRIAN WOERNER,**
*Plaintiff,*

v.

CASE NO. _4:18cv89 RH-??__

MDFL# 3-18-cv-261

**FLORIDA DEPARTMENT OF
CORRECTIONS, in its official capacity,
an Agency of the State of Florida;
JULIE L. JONES, in her official, supervisory, and
individual capacity as Secretary of
Florida Department of Corrections;
TOM REIMERS, in his official, supervisory, and
individual capacity as Director of Health Services
Administration of Florida Department of Corrections;
MICHELLE SCHOUEST, IISC, in her official,
supervisory, representative, and individual capacity as
Government Operation Consultant III SES of Florida Dept. of Corr.;
CORIZON, LLC, in its official, representative, supervisory, and
corporate capacity as an out-of-state Limited Liability
Corporation doing business and Registered in Florida;
CENTURION MANAGED CARE OF FLORIDA, LLC,
in its official, representative, supervisory, and corporate capacity as
an out-of-state Limited Liability Corporation doing
business and registered in Florida;
DR. A. LADELE, DO, Medical Director, in his
official, supervisory, and individual capacity;
DR. C. HADDAD, MD, Chief Medical Officer, in his official,
supervisory, and individual capacity,**
*Defendants.*
_____/

FILED
3·16·18
CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

**42 U.S.C.§ 1983**

## AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Received MQ

## INTRODUCTION

1.  Plaintiff, **Kim Brian Woerner**, *pro se*, is a 56-year-old male currently serving a 12-year prison sentence in Florida Department of Corrections since 2011, is suffering from Hepatitis C (HCV) and its serious life-threatening complications: Fibrosis of the liver.

2.  After numerous administrative requests, sick-call requests, pleas for treatment, and completing the administrative grievance process not once, but twice, giving full notification to Florida Department of Corrections and All Defendants of their deprivation and violation of Mr. Woerner's Eighth and Fourteenth Amendment Civil Rights, ADA, RA, Florida Constitution, Article I § 17 rights; all by deliberate indifference, that has now become callous, bordering on malicious indifference with willful wanton disregard and recklessness conduct regarding his serious life-threatening medical condition.

3.  First, due to the Defendants' deliberate delays in not providing the current Community Standard of Care, (Direct-Acting Antiviral Drugs) treatment, Mr. Woerner's viral infection was allowed to progress from the stage of Chronic HCV, to at least the bare minimal of Stage #1 Fibrosis of the liver, possibly even further along than that, as the Needle Liver Biopsy was not totally conclusive, being subcapsular.

4.  Then, Mr. Woerner was recklessly and callously denied treatment by Dr. A. Ladele, DO, after the specialist, Dr. Radi, a Gastroenterologist, prescribed and ordered an 8-week regiment of 400 mg. Harvoni 1xday, knowing full well that Mr. Woerner's life-threatening condition will only progress stage-by-stage through Fibrosis into irreversible Cirrhosis, followed by a painful, gruesome death, unless treated. Dr. A. Ladele, DO, Medical Director of Florida Department of Correction, Lake Butler, Reception and Medical Center (RMC) in his reckless

2

and callous indifference, put a stop-order upon Mr. Woerner's desperately needed **(approved)** prescribed treatment overriding a specialist in the field of HCV infections, to save costs, as Harvoni is approx. $1,000.00 a pill x 60-days. There is no extenuating medical reason for the refusal.

5.   All of the above and much more will be brought to the Court's attention showing that by FDC's H.S.B. 15.03.09 Supplement #3, HCV Management Policy, Protocol, Practice, Procedure, and Custom, as well as through Defendants' Florida Department of Corrections, Julie L. Jones, Tom Remiers, Michelle Schouest, IISC, Corizon LLC., Centurion Managed Care of Florida, LLC, Dr. A. Ladele, and Dr. C. Haddad, deliberate denials and delays for treatment of a serious medical need; violated and deprived Mr. Woerner of his rights guaranteed by the Constitution of the United States of America and Florida.

6.   Mr. Woerner's condition has progressed into a now life-threatening physical injury having been done with deliberate, if not callous and/or malicious indifference, by the aforementioned Defendants. The Defendants did this with willful, wanton, disregard, and reckless conduct, and continues to do so causing continued harm to Mr. Woerner. The Defendants also have full knowledge that the further along the stages progress, the less likely treatment will work and the greater risk of contracting Heptacellular Carcinoma (HCC) liver cancer; even as much as a 50% chance once Cirrhosis is reached, even then if HCV treatment is successful, a full liver transplant probably will still be necessary, as by then, full decompensation of the liver has occurred and Mr. Woerner's liver will most likely be in complete failure.

7.   FDC's H.S.B. 15.03.09 Supplement #3 HCV Management Policy, Protocol, Practice, Procedure and Custom concerning HCV is staged so numerically high that only those with Stage

3

2 Decompensated Cirrhosis even have a chance at treatment; if even then, if the disease hasn't progressed to the point where treatment will no longer be effective. Thus, Mr. Woerner is in desperate need of this Court to enjoin and order Florida Department of Corrections through injunctive measures to administer the full Harvoni treatment prescribed by Dr. Radi to **cure** him of his HCV, as he continues to suffer complications, and before the damage is completely irreversible or he is subjected to a painfully gruesome, premature death.

## JURISDICTIONAL VENUE

8.   Plaintiff beings this action before the Court and Jurisdiction is invoked pursuant to and predicated in part upon 42 U.S.C. § 1983, which authorizes action to redress the depravations, under the color of state law, of rights, privileges, and immunities secured to the Plaintiff by the Eighth and Fourteenth Amendments of the Constitution and laws of the United States of America.

9.   Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, in that this is a Civil Action rising under the Constitution and laws of the United States of America.

10.   Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(3) in that this action seeks to redress the deprivation under the color of state law, of rights, privileges, and immunities secured to the Plaintiff by the Eighth and Fourteenth Amendments of the Constitution and laws of the United States of America.

11.   Jurisdiction of this Court is invoked pursuant to the Americans with Disability Act (ADA) 42 U.S.C. § 12132 *et seg.* In that this action seeks to redress this deprivation, under the color of state law, of rights, privileges, and immunities secured to the Plaintiff by this Act.

12.   Jurisdiction of this Court is invoked pursuant to Section § 504 of the Federal Rehabilitation Act, 29 U.S.C. § 794, in that this action seeks to redress this deprivation under the color of state law, of rights, privileges, and immunities secured to the Plaintiff by this Act.

13.   Supplemental Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367(a) to adjudicate, redress the deprivation of the Florida State Constitution, laws of the State and Constitutional Claims, under the color of state law.

14.   Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Rule 65, Federal Rules of Civil Procedure, as Plaintiff seeks Temporary, Preliminary and/or Permanent Injunctive Relief and Protective Order and Declatory Judgment.

15.   The Venue which lies in this district is appropriate pursuant to 28 U.S.C. § 1391(b)(2), *et seg.*, since a substantial part of the events, Defendants acts, and/or omissions given rise to this action's claims occurred within this district, in Leon County, Florida, and shall be heard in the Tallahassee Division of the Northern District Court, in and for the Eleventh Circuit Court of the United States.

## PARTIES

16.   Plaintiff; **KIM BRIAN WOERNER** is a 56-year-old adult individual currently incarcerated in Florida Department of Corrections at Avon Park Correctional Institution Work Camp (AVPCI W/C). Mr. Woerner sues for; Injunctive, Declatory relief, as well as seeks Nominal, Punitive, and Compensatory Damages, on behalf of himself, that he previously has been, continues to be, subjected to, and may in the future, continue to be subjected to Florida Department of Corrections and all other Defendants discriminatory and unconstitutional H.S.B. 15.03.09 Supplement #3 HCV Management Policy, Protocol, Practice, Procedure and Custom

for treating Hepatitis C (HCV) infection. He continues to undergo cruel and unusual punishment not being treated equal with other inmates within and outside the FDC that are in need of life-saving medication in accordance with the Community Standard of Care. Due to the use and administration of said H.S.B. 15.03.09 Policy by the Defendants either in act or omission continue to cause harm and injury to Mr. Woerner.

17. Defendant; **FLORIDA DEPARTMENT OF CORRECTIONS (FDC)** is an agency of the State of Florida, that operates Avon Park C.I. and Work Camp, FDC's Reception and Medical Center, Main and West Units Lake Butler, Wakulla Correctional Institution Annex, relevant to this action among other Correctional Institutions throughout the State. The principle office for FDC is located in Tallahassee, Florida, 501 South Calhoun Street, Tallahassee, Florida 32393. FDC is responsible for providing adequate current medical health services that consist of the current Community Standard of Care and the creating and/or adoption and implementation of Policy, Protocol, Practice, Procedures and Customs that ensures equal appropriate medical treatment of inmates, as that of the non-incarcerated citizens of Florida, and the United States of America. FDC is sued in its official and supervisory capacity. At all times relevant FDC has acted and will continue to act under the color of state law. FDC is a public entity under Title II of the ADA, and receives Federal financial assistance within the meaning of the RA, and has at all relevant times.

18. Defendant; **JULIE JONES** is the Secretary of the Florida Department of Corrections (FDC). She is responsible for the oversight, operation, and administration of FDC system including, but not limited to, providing and administering equal adequate current Community Level Standard of Care medical health treatment; the formulation and/or adoption, implementation, and administration pertaining to its policies, protocols, practices, and procedures

6

and customs. These are to ensure the equal proper up-to-date provisions and administration of the current standard of care medical treatment to Mr. Woerner and all other inmates. She is being sued in her official, supervisory, and individual capacity. At all times relevant, Defendant **JULIE JONES** has acted and will continue to act under the color of state law.

19.   Defendant; **JULIE JONES** has statutory authority to implement policy change within the injunctive portion of the relief sought in this complaint. See § 20.315, Fla. Stat.  Her principle office is located at 501 South Calhoun Street, Tallahassee, Florida 32393.

20.   Defendant; **TOM REIMERS** is Director of Health Services Administration of the FDC. He is responsible for supervising and monitoring the administration, delivery, practice, and customs of all medical, mental health, and dental care services throughout the State of Florida's correctional system, as well as participating in the formulation, and/or adoption and implementation of all medically related policies, protocols, practices, procedures and customs for Mr. Woerner and all other inmates within FDC of which must be provided and administered at a level equal to and consistent with the current Community Standard of Care. Defendant; **TOM REIMERS** is sued in his official, supervisory and individual capacity. At all times relevant, he acted and will continue to act under the color of state law. His principle office is located at 501 South Calhoun Street, Tallahassee, Florida 32393.

21.   Defendant; **MICHELLE SCHOUEST, IISC** by acting as representative for Julie L. Jones, Secretary of Department of Corrections has become responsible for supervising and monitoring the administration of the H.S.B. 15.03.09 Supplement #3 Hepatitis C Virus Infection Management Policy, Protocol, Practice, Procedure and Custom, as well as selecting which inmate, including, but not limited to, Mr. Woerner, who will or will not receive treatment after

the recommendation/order of such treatment by a qualified specialist (expert) in the field of HCV heptic infections, and is to keep with the current Standard of Care as is found in the surrounding communities.

22.   Defendant; **MICHELLE SCHOUEST**, IISC Government Operation Consultant III SES of Florida Department of Corrections is sued in her official, supervisory and individual capacity. At all times relevant, she acted and will continue to act under the color of State law. Her principle office is located at 501 South Calhoun Street, Tallahassee, Florida 32393.

23.   Defendant; **CORIZON, LLC, (Corizon)** is an out-of-state Private Limited Liability Corporation, doing business and registered in Florida by and through their registered agent C.T. Corporation Systems. Upon Information and belief, Corizon, LLC was formerly Corizon, Inc., the corporation that was under contract with FDOC in 2011 to provide Medical Health care to inmates housed at South Florida Reception Center, Miami, Florida, Okeechobee C.I., Wakulla C.I. Annex, Reception and Medical Center Main and West Units, Lake Butler, Florida, Avon Park C.I./Work Camp. Corizon, Inc. dissolved and then converted to Corizon, LLC, on December 13, 2013 and has all the assets and liabilities of Corizon, Inc. at all times relevant to this action.

24.   Defendant; **CORIZON'S** previous contracts with FDOC/FDC required the provision of Medical Health care to Mr. Woerner and all other inmates housed at the aforementioned facilities and others throughout Florida.

25.   Defendant; **CORIZON** being a Health Care Provider is/was liable and responsible for providing and administering to inmates including Mr. Woerner the current prevailing Community Standard of Care treatment for Hepatitis C, as well as all other forms of treatment.

8

Corizon, LLC is being sued in its official, supervisory and corporate capacity. Corizon, Inc. and Corizon, LLC's contracts were in effect at all times relevant and material to this action. Both Corizon, Inc. and Corizon, LLC, have failed for questionable reasons to complete and fulfill their 5-year term contracts, which prematurely ended on or about April of 2016.

26.  Defendant; **CORIZON**, at all times relevant and material to this action has acted and will continue to act under the color of state law as a corporation contracted by the State of Florida by and through Florida Department of Corrections. Corizon, LLC, principle office is located out-of-state in Brentwood, Tennessee, and is doing business and registered in Florida, by and through its registered agent C.T. Corporation Systems located at 1200 South Pine Island Road, Plantation, Florida 32334. All service will be conducted through its Registered Agent and/or Attorneys of Record.

27.  Defendant; **CENTURION MANAGED CARE OF FLORIDA, LLC, (CMC)** is the current contracted Health Care Provider for FDC; an out-of-state corporation doing business and registered in Florida. Upon Information and belief, CMC's contract went into effect April/May of 2016, taking over from Corizon, LLC's, failed contract. Thus, by acceptance of the new FDC contract, CMC became the FDC Medical Health Care Provider making them liable and responsible to provide and administer the current prevailing Community Standard of Care, Medical Health care to include, but not limited to, that of treatment for Hepatitis C to Mr. Woerner and all other inmates in Facilities covered by their contract to include but not limited to the aforementioned Facilities relevant and material to this action. Also, by agreement of this contract, CMC has become liable and responsible for the adoption and/or formulation, implementation and use of the Health Services Bulletin 15.03.09 Supplement #3 Hepatitis C

Management and/or any other Hepatitis C, Policy, Protocol, Practice, Procedure, and Custom set forth and agreed upon by CMC and FDC in their aforementioned contract.

28.   Defendant; **CENTURION MANAGED CARE OF FLORIDA (CMC)** is being sued in its official, supervisory and corporate capacity. CMC's contract with FDC was and is in effect at all times relevant and material to this action. Also, at all times relevant and material to this action, **CMC** has acted and will continue to act under the color of state law as a corporation contracted by the State of Florida by and through Florida Department of Corrections.

29.   Upon Information and belief, **CMC'S** principle office is located in St. Louis, Missouri and is doing business and registered in Florida by and through its registered agent C.T. Corporation Systems, located at 1200 South Pine Island Road, Plantation, Florida 32334. All service will be conducted by and through the registered agent and/or Attorney of Record.

30.   Defendant; **DR. A. LADELE, DO** is/was Medical Director upon Information and belief employed by FDC by and through CMC, at the North Florida Reception and Medical Center (RMC) Main Unit, Lake Butler, Florida, at all times relevant and material to this action. Dr. A. Ladele being a doctor foremost is held to his 'Hippocratic Oath', and also is officially, supervisory and individually held liable and responsible for providing and the administering of the current prevailing Community Standard of Care, and to provide such treatment equally among all inmates, as well as equal to those outside of FDC in the surrounding communities and the State of Florida, as well as oversight and administration of such to include, but not limited to the treatment of Chronic Hepatitis C (HCV). The implementation, administration and use of its H.S.B. 15.03.09 Supplement #3 Hepatitis C Virus Infection Management Policy, Protocol,

Practice, Procedure and Custom. But, foremost to follow and obey the 'Hippocratic Oath' he took upon entering the medical field.

31.   Defendant; **DR. A. LADELE, DO** is sued in his official, supervisory and individual capacity. At all times relevant and material to this action, Defendant has acted and will continue to act under color of state law. Upon Information and belief, Dr. A. Ladele, DO is still employed and located at the North Florida Reception and Medical Center, Main Unit, 7765 South C.R. 231, Lake Butler, Florida 32054, phone number (386) 496-6152.

32.   Defendant; **DR. C. HADDAD, MD** is/was Chief Medical Officer at the North Florida Reception and Medical Center (RMC) West and Main Unit, Lake Butler, Florida, at all times relevant and material to this action, employed by FDC by and through CMC. Dr. C. Haddad, MD being a doctor foremost is held to his 'Hippocratic Oath', and also is officially, supervisory and individually held liable and responsible for providing and the administering of the current prevailing Community Standard of Care, as well as oversight and administration of such to include, but not limited to the implementation, administration and use of Hepatitis C Policy, Protocol, Practice, Procedure and Custom (H.S.B. 15.03.09 Supplement #3 Hepatitis C Virus Infection Management Policy) for the treatment of Mr. Woerner, an inmate with Chronic HCV and all those others similarly situated. But, foremost to follow and obey the 'Hippocratic Oath', he took upon entering the medical field.

33.   Defendant; **DR. C. HADDAD, MD** is sued in his official, supervisory and individual capacity. At all times relevant, Defendant has acted and will continue to act under the color of state law. Upon Information and belief, Dr. C. Haddad, MD is still employed at FDC's Reception

and Medical Center's West Unit located at 7765 South C.R. 231, Lake Butler, Florida 32054, phone number (386) 496-6152.

34.   Defendants; FDC, Jones, Reimers, Schouest, Corizon, CMC, Dr. A. Ladele, Dr. C. Haddad shall together here set forthwith in, be known as (Defendants) for all purposes relevant unless specifically named as an individual Defendant(s).

## FACTS

### General Fact of Hepatitis C

#### The Hepatitis C Epidemic

35.   Hepatitis C (HCV) is a viral infection primarily spread through the contact with infected blood, though some cases have been reported to be spread by semen in sexual intercourse, and contracted by infected mother to child during birth.

36.   The major means of transmission are the sharing of equipment for injection of drugs, tattooing, body, ear, piercing, needle stick injuries, fights, razors, and toothbrushes.

37.   By information and belief HCV has been known to stay dormant up to 45 days in dry blood.

38.   HCV attacks the liver and causes hepatitis or liver inflammation which significantly impairs the liver's ability to perform as designed and assist the body in the digesting of essential nutrients, filter-out toxins from the blood, and help in a major part of the immune system preventing disease and many more functions of the body that will be discussed later.

39.   HCV can be of an acute or chronic nature. Acute infection is a short term illness usually less than 6-months of exposure which in most cases leads to Chronic HCV infection, but the body can in some cases clear itself within the 6-month period.

40.   Chronic HCV infections are serious, long-lasting illnesses that can progress and due to a number of complications become life-threatening, and unless treated; is life-long in duration; in some cases progressing to **Fibrosis** and on into **Cirrhosis** ending in a very painful and gruesome premature death.

41.   Some of the complications of Chronic HCV can result in fatigue, weakness, muscle wasting, jaundice, constant skin rashes, itching, arthritic pain, mental confusion and memory loss, among others.

42.   HCV is the leading cause of Fibrosis, Cirrhosis, and Heptacellular Carcinoma (HCC) cancer of the liver.

43.   Fibrosis of the liver is the scarring/hardening of the tissues, cells and arteries inside the liver; which between Stages 1-3 can be reversible in most cases if treated. If HCV is eliminated the liver can regenerate itself.

44.   Once Fibrosis is developed, a process where healthy liver tissue is replaced with scaring, scar tissue cannot perform the job of normal healthy liver cells, so Fibrosis reduces liver function and results in many of the same symptoms as listed above, but with much greater intensity. Fibrosis also raises the chance of (HCC) liver cancer by 30-40%.

45.   Fibrosis at Stages 4-5 becomes Cirrhosis and permanent scar tissue begins to take over most of if not all of the liver. Of those with HCV, the majority will develop Chronic HCV and approximately 20% will develop into Fibrosis/Cirrhosis in a 20-year period.

46.   Cirrhosis causes additional painful complications including constant widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst and cause bleed-out), easy bruising, ascites (fluid accumulation in the legs and abdomen that needs draining), encephalopathy (alteration of the brain's structure) causing (mental confusion, disorientation, short/long-term memory loss, dementia, Alzheimer's, etc.), lymph disorders, increased risk of infections, loss of eyesight, seizures and extreme fatigue. **(Most of these complications can and do start occurring in the stages of Fibrosis before Cirrhosis is ever reached)**. If they go untreated, some of these complications can cause very painful and gruesome death, often from infections, bleeding that will not coagulate, and fluid retention until the skin and muscle tissue rupture. All will and do affect the quality of life, livelihood, and the entire family as a whole.

47.   If not timely treated, liver transplant is a major probability. Liver transplants are extremely expensive, very painful, carry a significant risk of complications, and/or total rejection. The recipient must be placed on a waiting list, which is timely, and a donor match may not be found in time. They are also almost never heard of being done for an inmate, especially an indigent one. Transplants result in even lower recovery rates than timely treatment with the current prevailing Community Standard of Care's direct-acting antiviral drugs (DAADs) and are extremely costly 250-500k or more, verses the 60-90k for DAADs cost for a single patient. If purchased in large quantity, this cost would dramatically decrease.

14

48.   Stage 4 Cirrhosis or compensated Cirrhosis is the irreversible, permanent scaring of the liver, which if left untreated will result in Stage 5 or decompensated Cirrhosis which results in full liver failure, esophageal varices (bleed-out), a 50% chance of liver cancer. Even if the HCV is cured at this point a liver transplant is probably necessary for the patient to live a normal life span.

49.   HCV is a physiological disorder or condition that effects one or more body systems, including, but not limited to, digestive gastrointestinal, immune system, circulatory, cardiovascular hemic systems, as well as the structure and functions of the brain, and is therefore a physical impairment.

50.   This physical impairment substantially limits one or more major life activities, sexual activities, including but not limited to, eating, walking, eyesight, hearing, bending, lifting, reproduction, concentration, thinking, memory, and communication. All affecting work, livelihood and daily functions in and around the home or workplace, thus affecting the entire family.

51.   HCV also effects the operation of major bodily functions: digestive, gastrointestinal immune, reproductive, circulatory, cardiovascular, hemic systems, mental functions and the healthy operation of the liver.

52.   HCV is a disease that the Center for Disease Control and Prevention (CDC), American Association and Study of Liver Diseases (AASLD), Infectious Disease Society of America, Federal Bureau of Prisons (BOP), Veterans Administration and even Florida's own Medicare and Medicaid, known Medical Authorities; have recommended Direct-Acting Antiviral Drugs to all people that have Chronic HCV no matter the stage the infection is at; stating the earlier the

15

stage the more effective the treatment, they require no numerical qualifications, such as FDC's H.S.B. 15.03.09 Supplement #3 Hepatitis C Virus Infection Management requires.

53.   HCV (like HIV) is a disease that is recognized by the Americans with Disabilities Act as being a disability, as it affects a number of life's major activities, as listed in paragraphs 49 thru 51 causing loss of work or work productivity, loss of productivity around the home, sexual activity and reproduction, eating due to digestive complications, arthritic pain mobility of movement, pain and suffering, not only physical, but mental as well, with anxiety, fear of pain, suffering, quality of life, loss of time spent with family and ultimately a painfully gruesome, premature death.

54.   HCV is a very unpredictable disease, we cannot predict who will contract Chronic HCV nor who will or will not progress into serious life-threatening Fibrosis, Cirrhosis or Heptacellular Carcinoma (HCC). Yet, we do know that it is only approximately 20-25% that will progress into the serious stages.

55.   Also, we cannot predict the time-frame of the progression once Fibrosis has occurred. It could be as short as 6-months to 1-year before Cirrhosis is contracted and/or up to 5-10 years before Cirrhosis is contracted, and Cirrhosis also can turn into complete liver failure in as little as 6-months to 1-year or up to 5-years before a gruesome, painful death occurs.

56.   Also during these progression phases, the chance of contracting Cancer of the Liver HCC increases rapidly and goes from 30% - 50% or more.

57.   People within the minimal stages of Fibrosis or before respond better to HCV Direct-Acting Antiviral Drugs such as **Harvoni**, so this needs to be factored into the decision making

16

process of who gets treated and the prioritization of that treatment, especially when making of policies, protocols and the administration of them.

58.   Myth, "That people with **normal** AST/ALT to platelet or APRI scores have minimal if no disease progression. ALT (alanine aminotransferase) is an enzyme that is produced in the liver cells and released into the bloodstream when there is damage taking place in most (80%) of Chronic HCV patients.

59.   Yet there is a 20% that for unknown reasons do not produce **abnormal** levels of ALT/AST or APRI scores, but do have moderate to severe stages of Fibrosis and even early stages of Cirrhosis before the liver will start to produce these abnormal levels of the ALT/AST enzymes.

60.   For this reason, according to research done, many experts believe that the only way to be positive is to conduct a liver biopsy or at least non-invasive tests such as vibration-controlled transient liver elastography and FIB-4 blood test, rather than to try to rely or continue to rely on the APRI scoring once Fibrosis has been detected especially if this was found while the patient still showed a "normal" APRI Score.

61.   In Florida, Department of Children and Families (DCF), the agency reasonable for administering the Medicaid program, recently confirmed that in determining what is medically necessary and therefore covered by the Medicaid program. Direct-Acting Antiviral Drugs (DAADs) for HCV should be approved for all adult patients with a Chronic HCV diagnosis. DCF also specifically eliminated any requirement that there be any evidence of heptic-Fibrosis before covering treatment. Thus, DCF has recognized that the current prevailing Standard of

Care for treating HCV is to provide immediate treatment with DAADs to all patients with Chronic HCV regardless of the stage of the disease.

**Hepatitis C in Prison**

62.   HCV is more common in prison than in the public due to the condensed population mainly being people whom suffer from the disease of addiction, and a large number being I.V. drug users, get tattoos, body piercings and practice unsafe sex.

63.   It is estimated that in 2016, between 16% to 41% of the U.S. jails and prison populations have HCV.

64.   FDC reported that 5,000 to 5,272 of the approximately 98,000 inmates have HCV. As of August 8, 2016, FDC listed 4,797 infected inmates found in its internal records.

65.   If mandatory opt-out testing was done as it is with HIV it would more likely be between 14,700 and 40,184 infected inmates.

66.   HCV is currently considered more contagious than even HIV and much more prevalent epidemic by the CDC, IDSA and other Medical Authorities.

67.   HCV between 2009 and 2013 alone rose 133% in Florida. This rate has surely increased since last recorded. FDC's estimate does not reflect this increase, especially with such a high at-risk population.

68.   Why mandatory opt-out testing is not done in FDC for HCV, but only HIV is a mystery that needs to be corrected in order to help stop the spread of HCV, not only within the prison

system, but also being brought back into the public realm. FDC has the highest at risk population in Florida.

69.    Screening for HCV infection is relatively uncommon in State prison systems. Treatment uptake has historically been limited, in part because of the toxic effects and long treatment duration of older interferon-based therapies (as well as concerns about the cost).

70.    In particular, truncation of HCV treatment owing to release from prison has been cited as a major limitation to widespread effective HCV treatment in correctional facilities.

71.    Shorter HCV treatment duration with DAADs reduces stay-related barriers to HCV treatment in prisons. Likewise, the improved safety of DAADs regimens diminishes concerns about toxic effects. Coordinated treatment efforts within prison systems would likely decrease the prevalence of HCV infection in this at-risk population, although research is needed in this area.

72.    Immediate treatment benefits include, but are not limited to, decrease in liver inflammation, reduction and even regeneration of the progression of Liver Fibrosis, reduction in the likelihood of the manifestation of Cirrhosis associated with complications, a 70% reduction in the risk of HCC (Liver Cancer), and a 90% reduction in the risk of liver-related death, and for public health safety a decrease in the spread of HCV, and a dramatic improvement in the quality of life for the person now cured of HCV.

73.    There currently is a 90%-95% cure rate for those treated with Direct-Acting Antiviral Drugs and up to a miraculous 100% cure rate even in as little as 2-days to 3-weeks with the

newer DAADs and the 3-drug combinations that are still in clinical trials. *(See HCV Advocate Vol. 19, Issue 10, pg. 2, October, 2016)* which can be found at: *www.hcvadvocate.org*.

74.   There are a number of drug companies coming together to fight this war on HCV and many clinical trials going on that need phase 3 testing outside of a clinical environment which FDC inmates could greatly benefit from, as well as FDC saving cost of medicating/treating these inmates that (**volunteer)** for these studies, trials. *(See HCV Advocate Monthly Pipeline Update dated October, 2016, Vol. 19, Issue 10)* which can be found at: *www.hcvadvocate.org*.

75.   Please note that for this information and more can be found at the following websites: *www.hcvadvocate.org/hepatitis/factsheets-pdf/HCV-Guide.pdf.*        Contact information at: *alanfranciscus@hcvadvocate.org*.   CDC:   *www.cdc.gov /Hepatitis /HCV / GuidelinesC.htm.* AASLD/IDSA/ISA-USA: *http://www.hcvguidelines.org/*.

## STANDARD OF CARE FOR HEPATITIS C INFECTIONS

76.   The old standard treatment, which included the use of interferon and ribavirin medications, failed to cure large numbers of patients and was known to cause very painful and adverse side-effects including psychiatric and autoimmune disorders, flulike symptoms, and gastrointestinal distress.

77.   Over the past 4-5 years since the approval by the Federal Drug Administration (FDA) of the new Direct-Acting Antiviral Drugs (DAADs) has greatly improved the treatment module for HCV infections.

78.   In 2011, the FDA approved the use of protease inhibitors called boceprevir (under the brand name Vicrtrelis) and telaprevir (under the brand name Incivek), and the Standard of Care

developed a 'triple therapy" to include the combination of either of these plus ribavirin and interferon. The triple therapy improved results for many patients, but continued to produce very painful and adverse side-effects and treatment could take 48-weeks to complete.

79.    In 2013, the FDA approved DAAD medication called simprevir (under the brand name Olysio) and sofobuvir (under the brand name Sovaldi). At this time, the recommended treatment was DAADs such as Sovaldi combined with ribavirin or interferon, depending on the patients other symptoms and medical diagnosis.

80.    In late 2014, the FDA approved the use of Sovaldi in combination with Olysio for the treatment of HCV.

81.    On October 10, 2014, the FDA specifically approved Harvoni, a pill that is taken once-a-day and combines sofobuvir and ledipasvir.

82.    Harvoni eliminates the need for the patient to take interferon and/or ribavirin, which was largely responsible for the adverse and difficult side-effects of treating HCV.

83.    Sovaldi (sofobuvir), Olysio (simprevir), and Harvoni have few side-effects, greater efficacy, can reduce treatment duration by 75%, and are administered orally instead of by injection.

84.    The new treatment modules utilizing these newest DAADs have very high cure rates (over 90% of the patients treated with Sovaldi and over 95% of the ones treated with Harvoni) have fewer and far less serious side-effects than the previous treatment modules and involve a far shorter treatment time of only (8-12 weeks).

85.   This New Community Standard of Care for HCV infections – the use of these latest DAADs – is now well-established. The CDC, American Association and Study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA) has recommended these new treatment modules and the Federal Bureau of Prisons (BOP), in 2014, adopted new Clinical Practice Guidelines that incorporate these new DAAD treatment modules. Under the CDC, AASLD, IDSA/ISA-USA and the BOP guidelines, the recommended treatment depends further upon the particularized genotype, the acute or chronic status of the disease, and prior attempts to treat the patient's HCV infections.

86.   On Information and belief, correctional systems in California, Illinois, Washington, Wisconsin, Oregon, and New York have also developed procedures to provide DAADs to individuals that fall within their guidelines and have started prescribing these life-saving medications to certain inmates.

87.   Florida DOC Policy for HCV infections is not being administered according to the current Community Standard of Care as provided by the above aforementioned agencies. *(See www.HCVguidelines.org)*-vs-(H.S.B   15.03.09, Supplement  #3  HCV  Management) upon information and belief FDC is currently not even administering any DAADs at all, not even according to their own guidelines; FDC has only given DAADs to 5 patients since 2014.

**FIBROSIS, RECOMMENDATION AND TREATMENT**

88.   Fibrosis is the hardening and scaring of the cells in the liver resulting from chronic heptic necroinflammation. If caught and treated early enough the liver can and in most cases will repair (rejuvenate) itself. But if left untreated Fibrosis at stages 4-5 become Cirrhosis which is permanent, irreversible scaring (hardening) of the liver.

22

89.   Early stages of Fibrosis are called (Metavir Stages F0-F1). There is a greater benefit to treating HCV in pre-Fibrosis or early (Metavir stages) of Fibrosis. It greatly increases the patient's survival rates as it allows you to achieve (SVR).

90.   SVR is Sustained Virological Response or (Sustained Virologic **Cure**), defined as the continued absence of detectable HCV RNA for at least 12-weeks after completion of therapy. Furthermore, patients who achieve SVR have a substantially improved quality of life, which spans their physical, emotional, and social health. Because of the many benefits associated with successful HCV treatment, clinicians should treat HCV-infected patients with antiviral therapy with the goal of achieving SVR, preferably early in the course of Chronic HCV infection before the development of severe liver disease and other complications.

91.   Initiating DAAD treatment of HCV in patients with lower Metavir stages of Fibrosis augments the benefit of SVR. Several modeling studies also suggest a greater mortality benefit if treatment is initiated at Fibrosis stages prior to F3 (Ovrehus, 2015); (Zahnd, 2015); (McCombs, 2015).

92.   Whereas treatment delay may decrease the benefit of SVR...a policy that restricts treatment to those only with Metavir Fibrosis Stage F3 or higher would increase mortality from Hepatocellular Carcinoma (HCC) and Cirrhosis, the number needed to treat to halve the prevalence of the disease is lower if all eligible patients receive treatment at diagnosis. A study based on the Swiss HIV cohort study also demonstrated that waiting to treat HCV infection until Metavir Fibrosis stages F3 and F4 resulted in 2-5 times higher rates of liver-related mortality, respectively, compared with treating at Metavir stages F2 or earlier.

23

93.   Fibrosis progression is variable across different patient populations as well as within the same individual over time. Many of the components that determine Fibrosis progression and development of Cirrhosis in an individual are unknown.

94.   Pretreatment Assessment: Evaluation for advanced Fibrosis using liver biopsy, imaging, and/or noninvasive markers is recommended for <u>all persons</u> with HCV infection, to facilitate decision making regarding HCV treatment strategy and to determine the need for initiating additional measures for the management of Cirrhosis (e.g. Hepatocellular Carcinoma screening).

95.   **<u>An accurate assessment of Fibrosis remains vital</u>**, as the degree of heptic Fibrosis is one of the most robust prognostic factors used to predict HCV disease progression and clinical outcomes.

96.   Although liver biopsy is the diagnostic standard, sampling error and observer varability limit test performance, particularly when inadequate sampling occurs. Up to one-third of bilobar biopsies had a difference of at least one (1) stage between lobes.

97.   Alternatively, if direct biomarkers (biopsy) or vibration-controlled transient liver elastography are not available, the AST-to-platelet ratio index (APRI) or Fibrosis-4 (FIB-4) index score can prove helpful—although neither is sensitive enough to rule out substantial fibrosis...

98.   Ongoing assessment of liver disease is especially important in patients whom treatment has been deferred. In line with <u>evidence-driven recommendations for treatment of nearly all HCV-infected patients</u>, several factors must be taken into consideration if treatment deferral is

entertained or mandated by lack of medication access. <u>As noted, strong and accumulating evidence argue against deferral</u> because of decreased allcause morbidity and mortality, prevention of onward transmission, and quality-of-life improvement for patients, treated <u>regardless of baseline Fibrosis...Deferral practices based on Fibrosis stage alone are inadequate and short-sighted</u>.

99.   Fibrosis progression varies markedly between individuals based on host, environment and viral factors. Fibrosis may not progress linearly. Some individuals (often those aged > 50 years) may progress slowly for many years followed by an acceleration of Fibrosis progression. Others may never develop substantial liver Fibrosis despite longstanding infection. <u>The presence of existing Fibrosis is a strong risk factor</u> for future Fibrosis progression. Fibrosis results from chronic heptic necroinflammation; thus, a higher activity grade on liver biopsy and higher serum transaminase values are associated with more rapid Fibrosis progression. <u>However, even patients with normal ALT levels may develop substantial liver Fibrosis</u> over time. <u>The limitations</u> of transient elastography and <u>liver biopsy</u> in ascertaining the progressions must be recognized.

100.  Host factors associated with more rapid Fibrosis progression include (1) male sex, (2) longer duration of infection, and (3) older age at time of infection...

**<u>PLAINTIFF KIM BRIAN WOERNER</u>**

101.  Plaintiff (Kim Brian Woerner) a 56-year-old male, currently serving a 12-year sentence in Florida Department of Corrections (FDC) and is suffering from Chronic Hepatitis C (HCV) as well as at least Stage #1 Fibrosis of the Liver, has been infected since at least 1994-95. Plaintiff was and is incarcerated in FDC at all relevant times, aside from paragraph <u>102</u>, listed below:

102. Plaintiff was informed by the Orlando Blood Bank that he was infected with HCV in 1994-95 after donating plasma.

103. Plaintiff entered FDC in 1995 and informed medical staff of his condition and requested treatment.

104. Plaintiff was told that he tested positive for HCV, but normal levels and treatment was not necessary. Mr. Woerner was released in 1996.

105. This same scenario occurred on Plaintiff's next subsequent incarceration – 1997-1999.

106. Plaintiff re-entered FDC in 2002-2005 and was placed on chronic clinic and given liver enzyme testing every 3-months. No viral load or genotype testing was known to be administered. Mr. Woerner was also told he was only a carrier, he did not need treatment.

107. Plaintiff in 2004-05 had several appendicitis attacks, and in January of 2005, Mr. Woerner's appendix ruptured and was removed, possibly caused by HCV complications and failure to previously treat Mr. Woerner's HCV, as the liver and appendix both operate within the immune system.

108. Plaintiff returned to FDC 2006-08 and informed medical staff of infection and asked about treatment. Mr. Woerner was told he was normal and Chronic Clinic changed to every 6-months. Mr. Woerner was told it is "New Policy".

109. Plaintiff was arrested on his current sentence in 2010 and placed in Broward County Jail Conte Unit. Plaintiff informed Medical of HCV and was placed on 30-day testing and given a 4000 calorie diet due to weight loss.

110. Plaintiff asked about treatment and was told to request treatment in Prison, and it should be provided.

111. Plaintiff entered FDC in August 2011, and once again, informed Medical Staff of his condition. Mr. Woerner was placed back on Chronic Clinic every 6-months at Okeechobee C.I. Plaintiff requested treatment and was told I did not qualify due to cost of treatment (approx. 90k). Mr. Woerner also was diagnosed with hypertension, possibly due to stress over HCV condition or HCV itself, as it affects the circulatory, cardiovascular and hemic systems. Hypertension is one of the many known complications of HCV.

112. Plaintiff in 2012 was transferred to Wakulla C.I. Annex Faith Based. Mr. Woerner informed Medical Staff of condition, was still on 6-month Chronic Clinic for both HCV and Hypertension.

113. Plaintiff's eyesight also started to fail, Medical said probably due to Hypertension, thus the root cause is probably HCV infection, and was issued glasses for the first time in life.

114. Plaintiff requested treatment for HCV and was told I did not qualify according to the (APRI score) and the cost was too much.

115. In 2014, Plaintiff took the Lifetime Wellness Program and after completion became a facilitator. During this course, Mr. Woerner learned about different forms of infectious diseases and focused on Hepatitis, especially HCV.

116. Plaintiff learned about testing and treatments especially the new treatments of Sovaldi (sofobuvir), Olysio (simprevir), Harvoni, and others. The new Direct-Acting Anti-viral Drugs (DAADs), the current Community Standard of Care protocol for treatment of HCV given by the

CDC, American Association and Study of Liver Diseases, Infectious Disease Society of America, Federal BOP, and many other medical authorities, and approved by the FDA.

117.  Plaintiff asked Dr. Samia Kozman – DEA #FK1770278 – about this and Dr. Kozman explained the APRI risk factor testing they did. Mr. Woerner was told he only scored at 0.2 and needed a 1.0-2.0 or above to qualify for treatment (Full Cirrhosis).

118.  Dr. Kozman also told Plaintiff he would turn Mr. Woerner's name in and it would be put in a lottery-type drawing, and if selected, they would treat me. Due to Policy, Protocol, Practice, Procedure and Custom, as well as the cost of treatment, this was all Dr. Kozman could do.

119.  Plaintiff inquired about his genotype and viral load. Dr. Kozman informed him that those tests had never been done.

120.  Dr. Samia Kozman ordered these tests on January 23, 2014, received on January 27, 2014. Plaintiff's genotype is **1a**. His viral load RNA, bDNA, QNT was **6,278,198 HI <3200 copies/ml**. His **RNA, bDNA, QNT** was **1,207,350 HI <615 Iu/ml**, both performed using Siemens bDNA. Assay.

121.  Plaintiff asked how he could be correctly scored if the above information (genotype/viral load) were not entered. Dr. Kozman told Mr. Woerner these were not necessary for scoring.

122.  According to Dr. Contarini, General Surgeon, Dr. Radi, Gastroenterologist, HCV Support Project, CDC, AASLD, IDSA, and other authorities, genotype and viral load play a major part of analysis in the progression and treatment of HCV.

123. Plaintiff's genotype being **1a** according to Standard of Care by CDC, AALD, IDSA, FBOP and others, the DAAD recommended treatment is Harvoni 400 mg. 1xday for 8-weeks, if viral load is < 6-million; 12-weeks if viral load is > 6-million.

124. Plaintiff once again requested treatment and was told even with a high viral load, so long as liver enzymes are normal – APRI score is below >1.0 – there is nothing wrong with the function and condition of Plaintiff's liver.

125. On February 16, 2015, Plaintiff started having severe upper-right-side abdominal pain for 2-weeks in area of (liver, pancreas, gall bladder). Dr. H. Matos, Medical Director at Wakulla C.I. Annex was Plaintiff's Primary Care Physician.

126. Dr. H. Matos prescribed Zantac 150mg., Bentyl 20mg. 3xday 1-week, KUB and ordered x-rays.

127. X-ray came back normal: No evidence of acute abdominal pathology, status post appendectomy. 02/13/2015. X-rays are so inconclusive they did not even pick-up a 1.6cm gallstone.

128. May of 2015, Plaintiff transferred to Avon Park C.I./Work Camp where Dr. William Padro, MD, Site Medical Director, became his primary care physician.

129. Continued Chronic Clinic at 6-month intervals asked about treatment for my HCV. Plaintiff was told by Dr. Padro I still didn't qualify and due to the cost of the treatment with a "normal" liver enzyme and I would not be treated.

130. Upper-right abdominal pain continued for 16-months and became worse (radiating through right-shoulder) on a scale of 1-10 between a 6-8 on a daily basis and sometimes a 10. Dr. Padro re-prescribed Benty/20 mg.

131. On November 5, 2015, Plaintiff was sent to Orlando and had an ultrasound done where gallstones were found and a C.T. scan was recommended.

132. Once the change-over from Corizon to CMC occurred in April/May 2016, I agreed to be sent to Lake Butler for C.T. scan and possible surgery. Also, since it was a new Medical Provider, Plaintiff was hoping to possibly be treated for his HCV.

133. Mr. Woerner's eyesight has continued to worsen and has had to have new prescriptions 3x since 2015. Even reading glasses have worsened from 150-300, in a 2-year period.

134. On December 12, 2015, Plaintiff filed first Informal Grievance #503-1512-0091 for FDC and Corizon's refusal to treat my HCV. Just because my liver enzymes are "normal", my viral load is over 6-million. Plaintiff was informed by A. Harris, Head of Classification (non-medical personnel) on December 23, 2015, that "You are using the grievance system to ask questions, you need to send an inmate request to medical to get your question answered." *(See Ex. 1, Informal Grievance #503-1512-0091).*

135. On December 28, 2015, Plaintiff re-filed another Informal Grievance #503-1512-0110, rewording it into only statements, stating facts only that the Medical Department was refusing to treat Plaintiff's HCV. Plaintiff was told he was not being denied treatment. "Your information and lab values are submitted **monthly**. From this, cases throughout the State are reviewed. Avon Park does not determine who receives treatment. We will continue to monitor you in your clinic and submit information **monthly**. Grievance Denied." *(See Ex. 2, Informal Grievance #503-1512-0110).*

136. On January 26, 2016, Plaintiff submitted another Informal Grievance #503-1601-0171; this time about the fact the previous one said they submit **monthly** reports, when in fact Plaintiff's labs are only taken once every 6-months. Mr. Woerner also stated that their **monitoring** is not treatment, especially when a cure is readily available and Plaintiff fits all medical requirements for treatment per Community Standard of Care. *(See Ex. 3, Informal Grievance #503-1601-0171).*

137. Ellen Preston, Senior Health Services Administration, Avon Park, on February 2, 2016, answered the above grievance stating, "The process for the Institutional level has been explained and carried out as explained in grievance #503-1512-0110. This grievance is being returned per 33-103.014 1(m) and (n). A decision has already been rendered to inmate and inmate is grieving a matter beyond control of this department."

138. On February 11, 2016, Plaintiff submitted a Formal Grievance #16-6-08349 to Secretary, Department of Corrections as Mr. Woerner believed this was of a medically sensitive nature. Said grievance was returned and Mr. Woerner was instructed to re-submit at the institutional level within 15-days. Yet, the heading FDC used was "Confidential Health Record/Care information intended for ADDRESSEE(S) ONLY. Unauthorized release or disclosure may violate state and federal law (returned 03/04/16). *(See Ex. 4, Formal Grievance #16-6-08349).*

139. On March 16, 2016, Plaintiff filed Formal Grievance #1603-503-037 at the Institutional level to the Warden about non-treatment, inadequate medical care, placing FDC and Corizon on Notice of Violation of Mr. Woerner's constitutional rights under the Eighth and Fourteenth Amendments, that it was placing the cost of treatment over the health care of its patient so they can continue to create a profit margin. This constitutes Deliberate Indifference. Mr. Woerner also

notified them that the Standard of Care DAADs (Harvoni) was adopted and being used by Federal Bureau of Prisons (Federal BOP). *(See Ex. 5, Informal Grievance #1603-503-037).*

140. This grievance was answered on March 23, 2016 by Dr. Wilma Padro and stated, "As explained in #503-1512-0110, you are not being denied treatment. You will continue to be monitored in your clinic and the report that contains your information is submitted monthly. This has been carried out by Avon Park Correctional Institution. Based on above, this appeal is Denied."

141. Plaintiff submitted his Formal Grievance Appeal #16-6-14881 to Secretary, Department of Correction, Julie Jones on March 25, 2016, explaining all of the aforementioned, plus more, placing her, FDC, and Corizon on notice of the violations of Mr. Woerner's Eighth and Fourteenth Amendment rights, also violation of ADA and Federal Rehabilitation Act, stating that this serious medical need could and will progress into full Fibrosis/Cirrhosis and possible Cancer of the Liver if left untreated. *(See Ex. 6, Informal Grievance #16-6-14881).*

142. Plaintiff's HCV condition does qualify as a disability under ADA, as it affects a "Major Life Activity," as previously stated in paragraphs 49 thru 51, regarding the Hepatitis C epidemic.

143. FDC is a federally funded public entity; so therefore, it also falls under the Federal Rehabilitation Act.

144. April/May of 2016, Corizon ceased to be FDC's Medical Provider and CMC became the current to date Medical Provider for Mr. Woerner.

145. According to Chapter 33-103.007 gives FDC a 30-day time limit in which to respond to grievances, unless an extension of time is requested in writing to the inmate and both parties

32

agree upon such extension. FDC never requested such extension and took 104-days to answer Formal Appeal. *(See Ex. 7, Notices of Inquiry).*

146. Plaintiff finally received a response dated July 13, 2016, answered by Tom Reimers, Director of Health Services Administration and T. Bowden, Warden, Secretary's representative stating, "...Please be advised your treatment is being deferred at this time until it becomes clinically indicated. In the meanwhile you will continue to be **monitored** in the Chronic Illness Clinic including diagnostic testing.... (Appeal DENIED)." *(See Ex. 6, Formal Appeal #16-6-14881).*

147. In the meantime, in May of 2016, Plaintiff was transferred to the Reception and Medical Center, Lake Butler, Florida Main/West Unit(s) for C.T. scan, possible surgery, and consultation with Dr. Contarini, General Surgeon.

148. C.T. scan determined Plaintiff had a 1.6 cm gallstone and would have to have his gallbladder removed.

149. Plaintiff spoke to Dr. Contarini about his HCV condition and the fact his Liver Enzyme scores are "normal", but his RNA Viral Load score is 6.2-million copies per m/l and 1.2-million I/u per m/l, and could he please help him get treatment.

150. Dr. Contarini informed Plaintiff that just because Liver Enzymes are "normal" and you have a High Viral Load does **not** mean your Liver is functioning fine and not damaged. Dr. Contarini called Dr. Radi the Gastroenterologist over into his office for an expert opinion and consulted with him about this. Dr. Radi concurred and said the same thing. Both agreed I needed a Liver biopsy and that was the best he could do for Mr. Woerner. If something was found then Plaintiff would have a leg to stand on, in his plight to get treatment.

151. On or about July 8, 2016, Dr. Contarini put a recommendation into Medical Director Dr. A. Ladele, DO for Plaintiff to have a cholecystectomy and a needle Liver biopsy done.

152. On July 8, 2016, Dr. A. Ladele approved lap cholecystectomy (lap chole), but **denied** Liver biopsy until further work-up is performed. Follow-up č PcP in 1-2 weeks for 3-phase C.T. for further evaluation and genotype and APRI score.

153. On the next consult, Dr. Contarini told Mr. Woerner that the biopsy had been denied by Dr. A. Ladele, but since he was his surgeon and was going to be inside his abdomen, if he happened to see something he didn't like, would Mr. Woerner mind if he did a biopsy of this. Mr. Woerner told him, "By all means, you're the surgeon."

154. On August 5, 2016, Plaintiff had lap cholecystectomy surgery and a needle Liver biopsy performed on him by Dr. Contarini, General Surgeon.

155. On August 9, 2016, Plaintiff had follow-up with Dr. Contarini. During this, Mr. Woerner was referred to Dr. Radi by Dr. Contarini to discuss his Liver biopsy, as the pathology report was not ready yet (Biopsy Report completed on August 9, 2016), but not sent to RMC for consultation yet.

156. Plaintiff was transferred back to Avon Park on August 19, 2016.

157. Plaintiff was transferred back to RMC for consultation with Dr. Radi on or about September 9, 2016.

158. Plaintiff went to consultation with Dr. Radi, Gastroenterologist on September 27, 2016. Yet, report of biopsy was not in Mr. Woerner's medical file. Plaintiff was rescheduled.

159. On October 11, 2016, Plaintiff saw Dr. Radi and was informed due to non-treatment of HCV he had now progressed into at least Stage #1 Fibrosis of the Liver. Yet, biopsy test result comment states that biopsies are subcapsular, therefore, the Fibrosis cannot be accurately estimated. So it could be **much** worse.

160. Dr. Radi, consulted with Mr. Woerner, and according to the current Community Standard of Care, prescribed Plaintiff Harvoni 400 mg. 1xday for 8-weeks and submitted a Drug Exception Request (D.E.R.) on October 11, 2016 to Dr. A. Ladele, DO, Medical Director at RMC Main Unit for approval, as these DAADs need to be special ordered and due to cost are not kept at the RMC pharmacy.

161. On November 1, 2016, Plaintiff went to a Medical Emergency for heart palpitations. While at Medical, he requested an update on his previously prescribed Harvoni treatment.

162. Plaintiff was informed by RN-D. Peel at RMC West Unit that he would not be receiving any Harvoni as there was no D.E.R. in his Medical file. RN-Peel placed a note to the Nurse Practitioner to have another D.E.R. submitted.

163. In follow-up, on November 11, 2016, RN-Fitzpatrick had a request submitted to ARNP-L.A. Wisnowski to re-submit another D.E.R. as the prescription by Dr. Radi was in Plaintiff's Medical file.

164. ARNP-L.A. Wisnowski re-submitted D.E.R. to Chief Medical Officer C. Haddad, MD for approval.

165. On December 1, 2016, Chief Medical Officer C. Haddad, MD **approved** the D.E.R. for Plaintiff's Harvoni, 400 mg. 1xday for 8-weeks and that was submitted on December 5, 2016 to be filled.

166. On December 7, 2016, Plaintiff went to Information Sick-Call about Harvoni treatment. Mr. Woerner was told about **approval** and **approval** was faxed to Main Unit Pharmacy to be filled.

167. On or about December 9, 2016, Plaintiff went to West Unit pill window to check on Harvoni prescription. At this time, Plaintiff was informed that according to Pharmacy Technician Amanda at the Main Unit, Dr. A. Ladele put a **stop-order** on Plaintiff's Harvoni prescription and was also informed to stop any other Harvoni or (DAAD) prescriptions in the future.

168. Plaintiff now, by Dr. A. Ladele's willful and wanton disregard and reckless conduct, as well as Dr. A. Ladele's callous indifference to Mr. Woerner's serious medical condition would cause Mr. Woerner to not be receiving his finally approved, promised care that would save his life, and return it to a normal quality of life possibly eliminating his hypertension, relieving undue stress and even return of proper eyesight.

169. Plaintiff put in another Information Sick-Call and was seen on December 19, 2016 by RN-D. Peel about the denied Harvoni D.E.R. stop-order by Dr. A. Ladele. RN-D. Peel verified that Dr. A. Ladele did put a stop-order denial on it.

170. On January 6, 2017, Plaintiff submitted another Information Sick-Call requesting a copy of the full interim protocol for treatment of HCV to include Policy and Procedure of testing, monitoring, evaluation of levels, Standard of Care, and Policy for use of new DAADs.

171. On January 10, 2017, Plaintiff was seen about the Information Sick-Call and was told by RN-Supervisor Amy Angel that they do not have any of the information that he requested. The doctors are the ones who have this.

172. On January 10, 2017, Mr. Woerner submitted an Informal Grievance #209-1701-0144 to Dr. C. Haddad about the actions of Dr. A. Ladele denying the D.E.R. that he approved on December 1, 2016. *(See Ex. 7, Informal Grievance #209-1701-0144).*

173. On January 10, 2017, Plaintiff wrote another Formal Grievance #1701-209-088 to include the facts about Dr. A. Ladele's actions and the fact now that Mr. Woerner has suffered a serious physical injury due to FDC and all other Defendants' acts and omissions have caused at the bare minimum Deliberate Indifference to his previous and still existing serious medical need of Hepatitis C causing the current physical injury of at least Stage #1 Fibrosis of the Liver. Also, once again, Mr. Woerner put FDC and CMC on notice, once again. *(See Ex. 8, Formal Grievance #1701-209-088).*

174. On January 25, 2017, I received an answer to Informal Grievance #209-701-0144, but it was answered by J. Moore, Grievance Coordinator, not Dr. C. Haddad. It stated, "You have an option to access sick-call to be evaluated." It had nothing to do with the statements on the grievance, but instead was just another means of deliberately delaying treatment and avoidance of answering truthfully, almost as if they are covering up for the actions of Dr. A. Ladele. *(See Ex. 8, Formal Grievance #209-1701-0144).*

175. On January 31, 2017, Plaintiff had follow-up with Dr. Radi. Plaintiff explained what had occurred with Dr. A. Ladele and the disappearance of the D.E.R. Dr. Radi wrote on October 11, 2016, and the subsequent D.E.R. Dr. C. Haddad approved on 12/1/2016 and how Dr. A. Ladele, DO put a stop-order on the prescription that he, a Specialist, originally wrote. Dr. Radi became angry at what Dr. A. Ladele had done.

176. Plaintiff also asked Dr. Radi about the Policy, Procedure (H.S.B. 15.03.09) for HCV and was told those are in Tallahassee; they do not have them there at RMC.

177. Dr. Radi, the gastroenterologist at that time, once again prescribed Harvoni 400 mg. 1xday for 8-weeks and submitted another D.E.R. to Dr. A. Ladele, DO, Medical Director.

178. On February 2, 2017, Response to Grievance #1701-209-088 was received, responded by both, C. Haddad, Chief Medical Officer who originally approved the D.E.R. on December 1, 2016 and Assistant Warden Polk stating, "Your condition is being monitored with continuous lab work to determine the current status of your chronic condition. You will have labs completed with consideration of imaging soon for further evaluation. Upon results of labs and potential imaging, you will have an appointment w/primary care provider, to discuss results. **You are being treated in accordance with DC Policy and Procedure**. Your grievance is hereby Denied." This shows FDC's and CMC's Policy H.S.B. 15.03.09 Supplement #3 is causing reckless and callous indifference to Plaintiff, with imminent danger of further physical injury and premature death. *(See Ex. 9, Formal Grievance #1701-209-088).*

179. As Mr. Woerner falls into the 20% "normal" APRI Score, but has moderate-severe liver disease, labs do not reflect the progression of Mr. Woerner's condition. And if his Specialist was ever consulted about his condition they would know this.

180. On February 14, 2017, Plaintiff submitted an Appeal Grievance #17-6-07485 to Secretary, Department of Corrections, concerning the denial for Grievance #1701-209-088, putting FDC on Notice again for violation of Eighth and Fourteenth Amendment rights to equal and proper medical care, violation of Florida State Constitution Article I Section 17, Cruel and Unusual Punishment, Chapter 33-208.002(8), (10), (12), (19), Willful and Wanton Disregard and

Reckless Conduct by Deliberate Indifference to Plaintiff's now life-threatening medical needs of Hepatitis C and physical injury Stage #1 Fibrosis or greater that require an immediate response...(A Portion of the Relief Sought, but not limited to: Immediate approval and full treatment regimen of Harvoni 400 mg. 1xday for 8-weeks or until (SVR) no viral load is detected as prescribed by Dr. Radi with all testing and follow-up to assure the cure). *(See Ex. 10, Formal Appeal Grievance #17-6-07485)*.

181. On March 28, 2017, Plaintiff had his last appointment with Dr. Radi, a pre-scheduled follow-up; for after completion of treatment; of which never happened.

182. Dr. Radi was going to once again write another prescription and put in another D.E.R., as just the last D.E.R. submitted on January 31, 2017 to Dr. A. Ladele, Medical Director, disappeared again.

183. RN-Noel Strange told Dr. Radi that no matter how many D.E.R.s he put in, all of them would be disapproved unless I had end stage Decompensated Cirrhosis; she said she was told in a meeting approximately 1-month ago by Dr. A. Ladele.

184. As of April 7, 2017, the D.E.R. that Dr. Radi submitted to Dr. A. Ladele once again disappeared, now showing Dr. Ladele's malicious indifference to Mr. Woerner's condition. This way it would appear that Dr. Ladele never approved or disapproved the D.E.R.; a convenient way to disapprove without putting your signature on any document and escape the possible consequences of libel.

185. So Dr. Radi released the hold on Plaintiff so he could return to his permanent Institution of Avon Park Work Camp since he would not be receiving his prescribed treatment.

186. Plaintiff asked Dr. Radi if he would be an Expert Witness on his behalf. Dr. Radi said he did not think his contract would allow that. But, if he was subpoenaed he would testify truthfully about all that has occurred, and give his expert opinion regarding Mr. Woerner's condition.

187. Dr. Radi further said he would testify to the fact that he wrote and submitted D.E.R.s each time to Dr. A. Ladele, DO, Medical Director, and answer any other questions, as he is an expert in this field.

188. RN-Noel, Dr. Radi's assistant, asked Mr. Woerner to please pursue this as there are many inmates suffering from this and they can't be helped. Their hands are tied by the Protocol, Policy Procedure. They can only treat those that Tallahassee approves instead of all of the inmates including Plaintiff that so desperately need immediate treatment. She said she would also testify to all of this if subpoenaed.

189. Plaintiff asked RN-Noel who is on this Hepatitis C or Infectious Disease Committee that has authority over this Protocol, Policy, and Procedure. She spoke with the SCRUB office and told Mr. Woerner to contact Dr. Cherry in Tallahassee. If he isn't on it he would know and could help Mr. Woerner find out who is.

190. Plaintiff asked once again for a copy of Policy, Protocol, Procedure and Custom at this time and was told that it was not available to be given, that I had to request that from Tallahassee.

191. Since that time, Plaintiff on April 25, 2017, mailed another Grievance to Secretary, Department of Corrections, concerning Ch. 33-103.007, as my Formal Appeal was received and

filed on February 17, 2017, and has not yet been responded to. FDC rule gives 30-days for response or they must request an extension in writing and it must be agreed upon by grievant. This was never done. *(See Ex. 11, Copy of Formal Grievance mail dated 4/25/2017 which was never responded to).*

192. As of August 24, 2017, neither the Appeal nor the Grievance about the violation of timely manner has been responded to. Thus, according to Ch. 33-103.007, Plaintiff may consider it denied and proceed on to next stage for relief.

193. Plaintiff's HCV virus will not be eradicated without treatment. Unless Plaintiff receives immediate treatment with Harvoni his Fibrosis will progress into Cirrhosis, possible HCC liver cancer and a premature painful and gruesome death will result. But, if treated with this Harvoni **cure**, Mr. Woerner has a 96% chance to achieve SVR and regain a normal life expectancy and a renewed quality of life, reversal of his hypertension and correction of his eyesight.

194. Since then, Mr. Woerner was once again transferred back to RMC in June of 2017 to see Specialist Dr. Radi for the follow-up to the treatment the Defendants refused to give him. If there was no treatment and none supposedly recorded in Mr. Woerner's Medical Record, why would Tallahassee and CMC have Mr. Woerner ordered to come back for follow-up. They do know they refused to give me treatment don't they? What's going on here?

195. Plaintiff finally received his response to his Formal Grievance Appeal from Secretary, Department of Corrections on September 13, 2017. It was answered by Michelle Schouest, IISC. She is a Government Operations Consultant III SES for the Department of Corrections. Why she was responding to a Formal "**Medical**" Grievance Appeal I do not know. She states in her response that she reviewed my records that were available to her. Since she is not a Doctor at

least by the title I don't believe she is, and I never did a Release of Information Form for her, she has violated Mr. Woerner's HIPPA Privacy Act by viewing Mr. Woerner's Medical Records. *(See Ex. 10, Formal Appeal Grievance 'Response' #17-6-07485).*

196. If per say Michelle Schouest never viewed Mr. Woerner's Medical file, then how could she properly determine the full extent of Mr. Woerner's condition and make a proper medical evaluation to determine if Harvoni treatment regimen that was ordered by Dr. Radi, a Gastroenterologist, was proper. She herself would need to be a specialist in the field of Hepatitis Infections to make an expert evaluation. She is not even in the medical field. This is another callously indifferent act of willful, wanton, reckless conduct on the other Defendants, and now Schouest.

197. According to Grievance Appeal #17-6-07485 dated September 13, 2017, (Appeal Denied). It states: "Your request for administrative remedy was received at this office and it was carefully evaluated. Records available to this office were also reviewed. In addition, the institution was contacted and they provided this office with information regarding the issue you presented. Please be advised that your treatment is being **deferred** at this time. In the meanwhile, you will continue to be monitored in the chronic illness clinic including diagnostic testing. Should you experience problems, sickcall is available so that you may present your concerns to your healthcare staff..." The usual pat answer that is given on most all medical grievances Mr. Woerner has filed as just another way of deliberately delaying (deferred) and being callously indifferent to Mr. Woerner's serious medical needs, by refusing to treat him without directly saying it. *Id.*

42

## CLAIMS

## COUNT I

**DEPRIVATION OF EIGHTH AND FOURTEENTH AMENDMENT RIGHTS TO EQUAL MEDICAL CARE TO NOT UNDERGO CRUEL AND UNUSUAL PUNISHMENT AND EQUAL PROTECTION UNDER THE LAWS...**

### PURSUANT TO 42 U.S.C. § 1983

(Against, Defendants: FDC, Julie Jones, Tom Reimers, Michelle Schouest, Corizon, CMC, Dr. A. Ladele, DO, Dr. C. Haddad, MD)

198. Plaintiff, Mr. Woerner incorporates and re-alleges paragraphs 1 through 197 of this complaint as if fully set forth herein.

199. All Defendants and their policymakers know about and enforce the policies, protocol, practices, procedures and customs described herein. Defendants and their policymakers know and have known of Mr. Woerner's serious medical needs, Mr. Woerner's physical injury caused by their deliberate delays and denials and the imminent danger Mr. Woerner currently faces and the further danger of greater physiological injury in the future if not treated.

200. Yet, all Defendants have intentionally failed, deliberately delayed (deferred), and/or refused and still refuses to provide the current prevailing Community Standard of Care to Mr. Woerner. The Direct-Acting Antiviral Drugs prescribed by a specialist in the field of HCV treatment that would have and will address those serious life-threatening medical needs of Mr. Woerner.

201. All Defendants are in full knowledge that their actions and omissions have resulted, will continue to result in the deterioration of Mr. Woerner's liver and will increase the complications he is already suffering exposing him to HCC Liver Cancer, complete Liver Failure and its symptoms, followed by an imminent painfully gruesome death.

202. All Defendants have caused and continue to cause the infliction of pain and suffering upon Mr. Woerner and have exhibited not only a **willful and wanton disregard and reckless conduct**, but deliberate even to the point of callous or malicious indifference to Mr. Woerner and his serious life-threatening medical need that is <u>not withheld</u> from other inmates. Such as those suffering from HIV, Tuberculosis, Cancers, Crohn's disease, and other serious life-threatening and non-life-threatening medical needs affording them with the medications needed to treat their conditions and sustain their lives, as provided for in our United States Constitution.

203. The events, actions, and or omissions of the Defendants were not done in a good faith effort to treat Mr. Woerner as the current prevailing Community Standard of Care dictates, but instead have intentionally delayed treatment (only monitoring) Mr. Woerner's condition and that not even properly as, it is known by all the Defendants that he is in the 20% group that tests "normal" using the APRI Score test even when liver damage is present, but instead of using other non-invasive testing such as the FBI-4 continue to use a non-effective APRI score test knowing of its non-effectiveness.

204. All Defendants know by deliberately denying/delaying Mr. Woerner's medically needed HCV treatment, have imposed and continue to impose cruel and unusual punishment far in excess of that authorized by law, contrary to the Eighth and Fourteenth Amendments.

205. All Defendants deliberate denials and delays of Mr. Woerner's medically necessary HCV treatment violates all standards of decency, contrary to the Eighth and Fourteenth Amendments.

206. All Defendants actions and omissions with respect to Mr. Woerner amount to much more than grossly inadequate care.

44

207. All Defendants actions and omissions with respect to MR. Woerner's medical care concerning his Chronic HCV and life-threatening complications of at least Stage #1 Fibrosis by only monitoring when a **cure** is readily available, so cursory as to amount to **NO** medical care at all.

208. Yet, we see that in other medical cases such as HIV, Cancer, Tuberculosis, Crohn's disease, and many others, that life-saving medication is provided to them. This shows a bias toward Mr. Woerner by not providing him with equal treatment as guaranteed under the Fourteenth Amendment.

209. At all times relevant all Defendants have acted and continue to act under the color of state law, and were and/or are either direct employees, contracted agents, state actors, agents of the state, and the events, the Defendants' actions, and/or omissions of such constitute official state and/or individual action and/or omissions were done with full knowledge, at all times relevant and material to this action.

210. The events, actions and/or omissions of all the Defendants were not done in a good faith effort to treat Mr. Woerner as the Community Standard of Care dictates, but in a deliberate and even callous and maliciously indifferent manner causing Mr. Woerner to suffer and continue to undergo cruel and unusual punishment and is not being equally treated with the same Standard of Care as any other incarcerated or un-incarcerated citizen in Florida or of the United States of America.

211. As a direct and proximate cause of this practice by the Defendants, their use of the correct Policy, Protocol, Practice, Procedure and Custom along with their individual deliberate even callous or malicious willful wanton disregard and reckless conduct by act or omission to

Mr. Woerner has caused him to suffer harm and physical injury. This deprives and violates Mr. Woerner's Eighth and Fourteenth Amendment rights guaranteed by the Constitution of the United States of America of which these harms and injuries will continue and may result in Mr. Woerner suffering a very painful and gruesome death, unless enjoined by this Court.

## COUNT II

### AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131 *et seg.*

(Against Defendants: FDC, Julie Jones, Tom Reimers, Michelle Schouest, Corizon, CMC, Dr. A. Ladele, DO, Dr. C. Haddad, MD)

212. Plaintiff, Mr. Woerner incorporates and re-alleges paragraphs 1 through 197 of this complaint as if fully set forth herein.

213. This count is a claim for disability discrimination for violation of Title II of the Americans with Disability Act (ADA). 42 U.S.C. § 12101, *et seg.* and 42 U.S.C. § 12131-12134 and its implementing regulations.

214. At all relevant times, all Defendants aforenamed have acted and will continue to act under color of state law.

215. Defendants FDC, Corizon Health Care, Inc./Corizon, LLC, and Centurion Managed Care of Florida, LLC are public entities within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104 and 28 C.F.R. § 39.130 of which Title II of the ADA prohibits disability-based discrimination by any public entity.

216. Plaintiff has Chronic HCV which is a physiological disorder or condition (i.e. viral infection) that affects one or more of the body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, reproductive, and hemic systems, and is

therefore a physical, as well as a physiological impairment. 42 U.S.C. § 12102(1) and (2); 28 C.F.R. § 35.108(a) and (b).

217. This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, eyesight, bending, lifting, concentrating, memory loss (short and long term), thinking, communicating, and reproduction; the operation of major bodily functions such as digestive, gastrointestinal, immune, reproductive, circulatory, cardiovascular, hemic systems, the function and structure of the brain, and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

218. Plaintiff has a medical record of having an impairment that substantially limits one or more major life activity, even if Defendants have not listed it as an ADA disability, he has a medical history of such impairment (Chronic HCV and Fibrosis of the liver). 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) and (e).

219. Plaintiff is regarded by Defendants as having an impairment that substantially limits one or more major life activities; Defendants perceive Mr. Woerner as having such an impairment. 42 U.S.C. § 12102(1)(C) and (3); 28 C.F.R. § 35.108(a)(1)(iii) and (F). All Defendants have subjected Mr. Woerner to a prohibited action because of an actual or perceived physical impairment.

220. Plaintiff is a qualified individual with a disability because Mr. Woerner has met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by FDC, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

221. Defendants have and are withholding medical treatment from Plaintiff who is infected with HCV, but not equally withholding medical treatment from those with other disabilities (i.e. HIV infected persons, cancer patients, persons with Crohn's disease, Tuberculosis, etc.) or those who are not disabled. FDC and all other Defendants exclude Plaintiff from participation in, and denies Mr. Woerner the benefits of FDC and all other Defendants' services, programs and activities (such as medical services and life-saving medication) by reason of Mr. Woerner's disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.103(a).

222. All Defendants have and are withholding medical treatment from Plaintiff who is infected with HCV, but not withholding medical treatment from those with other disabilities, or those who are not disabled, FDC and all other Defendants subject Mr. Woerner to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

223. All Defendants have and are failing to provide Plaintiff with equal access and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

224. All Defendants have and are utilizing criteria or methods of administration that have the effect of subjecting Plaintiff to discrimination and that defeat or substantially impair accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

225. All Defendants have known and were put on notice by Plaintiff in and through the full grievance process Mr. Woerner utilized, not once but twice, about the violations noted herein but has failed to correct them, thereby exhibiting deliberate even callous indifference to the rights of Plaintiff.

226. As a direct and proximate cause of these events, actions and/or omissions, Plaintiff has suffered and will continue to suffer from harm and violation of Mr. Woerner's ADA rights. These harms will continue unless enjoined by this Court.

## COUNT III

### VIOLATION OF REHABILITATION ACT, 29 U.S.C. §§ 791-794(a)

(Against Defendants FDC, Corizon, and CMC)

227. Plaintiff, Mr. Woerner incorporates and re-alleges paragraphs 1 through 226 of this complaint as if fully set forth herein.

228. This count is brought under Section 504 of the Rehabilitation Act (RA). 29 U.S.C. § 701 *et seg.*, and 29 U.S.C. §§ 791-794 *et seg.* and its implementing regulations.

229. At all times relevant Defendant FDC, Corizon and CMC has acted and continues to act under color of state law.

230. Defendant FDC, Corizon and CMC are public entities as defined by Title II of the ADA and RA which receives Federal financial assistance for programs. 29 U.S.C. § 794.

231. Defendant FDC, Corizon and CMC has and continues to exclude Plaintiff who is a qualified individual with a disability from participation in, and denies Mr. Woerner the benefits of programs, services, or activities solely by reason of Mr. Woerner's disability. 29 U.S.C. § 794(a); 28 C.F.R. § 42.503(a). (Including, but not limited to Medical Services).

232. Defendant FDC, Corizon and CMC has and continues to subject Plaintiff who is a qualified individual with a disability – to discrimination. 29 U.S.C. § 794(a).

233. Defendant FDC, Corizon and CMC has and continually denies Plaintiff who is a qualified handicapped person, the opportunity accorded others to participate in programs, services, or activities. 29 C.F.R. § 42.503(b)(1). (Including, but not limited to Medical Services).

234. Defendant FDC, Corizon and CMC has and continues to utilize criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap and defeat or substantially impair accomplishments of the Defendant's programs, services, or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3). (Including, but not limited to Medical Services).

235. Defendants have known about the violations noted herein by Plaintiff's notice of such violations in and through the full grievance process Mr. Woerner utilized, not once but twice.

236. As a direct and proximate cause of this exclusion, Plaintiff has suffered and continues to suffer harm, injury, and violation of Mr. Woerner's RA rights. These harms and injuries will continue unless enjoined by this Court.

## STATE CLAIMS

### COUNT IV

**DEPRIVATION OF RIGHT NOT TO UNDERGO CRUEL AND UNUSUAL PUNISHMENT UNDER THE FLORIDA CONSTITUTION ARTICLE 1 § 17.**

(Against Defendants FDC, Julie Jones, Tom Reimers, Michelle Schouest, Dr. A. Ladele, DO, Dr. C. Haddad, MD, Corizon, and CMC)

237. Plaintiff, Mr. Woerner incorporates and re-alleges paragraphs 1 through 197 of the Federal portion of this complaint as if fully set forth herein.

238. At all times relevant all Defendants have acted and continue to act under color of state law.

239. All Defendants' acts and/or omissions in failing to provide the Community's Standard of Care and administer such to Plaintiff constitutes a deliberate indifference to the serious new life-threatening medical needs of Mr. Woerner who is infected with HCV and the now serious life-threatening physical injury of at least Stage #1 Fibrosis of the liver: Thereby establishing a violation of Article 1 § 17 of the Florida Constitution and its prohibition against the infliction of cruel and unusual punishments.

240. By denying Plaintiff's medically needed HCV treatment (i.e. Harvoni) that would provide Mr. Woerner with a 96% chance of curing his HCV and liver Fibrosis and continued suffering due to complications of this lack of necessary treatment, all Defendants have imposed and continue to impose punishment far in excess of that authorized by law, contrary to the Florida Constitution Article I § 17.

241. All Defendants' actions and omissions with respect to Plaintiff amount to much more than grossly inadequate care.

242. All Defendants' actions and omissions with respect to Plaintiff's medical care is so cursory as to amount to **NO** medical care at all.

243. All Defendants have caused and continue to cause wanton infliction of pain, physical injury, harm and psychological suffering, anxiety, fear of continued suffering, and a painfully gruesome premature death, loss of time with family and loved ones, and have exhibited not only a willful wanton disregard and reckless conduct, but deliberate even callous indifference to

51

Plaintiff's serious life-threatening medical need in violation of Florida Constitution Article I § 17.

244. All Defendants' and FDC's policymakers know about and enforce the medical policies described herein. All Defendants' and FDC's policymakers know of Plaintiff's serious life-threatening medical needs, yet all Defendants have intentionally failed and refused to provide and administer Community Standard of Care treatment (i.e. Harvoni) that will address those serious life-threatening medical needs, knowing that these actions and omissions have resulted, and will continue to result in Mr. Woerner's continued suffering and exposure to Liver Failure and its symptoms, Liver Cancer, and imminent death if not treated.

245. As a direct and proximate cause of this described pattern and the use of all the Defendants' H.S.B. 15.03.09 Supplement #3 HCV Policy, Protocol, Practice, Procedure and Custom, and the deliberate even callous indifference, Plaintiff has suffered and continues to suffer from harm and physical injury and violation of Mr. Woerner's rights secured by the Florida Constitution Article I § 17 to not undergo cruel and unusual punishment. This violation and these harms and injuries that continue to progress place Mr. Woerner in imminent danger and will continue until Mr. Woerner suffers a gruesome death, unless enjoined by this Court.

## COUNT V

### DELIBERATE INDIFFERENCE – MEDICAL MALPRACTICE

(Against Defendants FDC, Julie Jones, Tom Reimers, Michelle Schouest, Dr. A. Ladele, DO, Dr. C. Haddad, MD, Corizon, and CMC)

246. State tort Medical Malpractice claims in Florida only require proof of mere negligence on the part of the Defendants. Mr. Woerner has gone beyond this qualification as shown in his Federal portion of this complaint's Eighth and Fourteenth Amendment, ADA, RA claims, by

proving at least deliberate if not callous or even malicious indifference and willful and wanton disregard and reckless conduct on the Defendants' parts.

247. Plaintiff, Mr. Woerner incorporates and re-alleges paragraphs 1 through 197 of this complaint as if fully set forth herein.

248. At all times relevant Defendants acted and continue to act under color of state law.

249. At all relevant times, the FDC, individual Defendants and corporate Defendants had a duty to act in accordance with the Community Standard of Care recognized by medical care professionals and to act as reasonable individuals and corporations would under the same or similar circumstances outside of FDC, they breached that duty in failing to provide and administer the Community Standard of Care necessary for the cure of HCV (DAADs, i.e. Harvoni) to Mr. Woerner who is all of the Defendants' responsibility as an inmate of FDC and under the care of such and its contracted medical provider, employees, agents and/or state actors.

250. Plaintiff's serious life-threatening injuries are the direct, legal and proximate result of all the Defendant's willful and wanton disregard and reckless conduct, by their deliberate even callous indifference to Mr. Woerner's condition that continues to be the Defendants' responsibility, and continues to suffer from their acts and omissions.

251. By denying Plaintiff his medically needed HCV treatment, Defendants' actions with respect to Mr. Woerner's medical needs for the cure for HCV amounts to more than grossly inadequate care.

252. All Defendants' acts and omissions have caused and are still causing even greater, serious life-threatening injury with respect to Mr. Woerner's medical condition of HCV and

Fibrosis of the liver by Defendants' delay and denial of the current Standard of Care DAADs to be administered, amounts to deliberate if not callous or malicious indifference to Mr. Woerner's worsening medical condition.

## COUNT VI

### DELIBERATE INDIFFERENCE – MEDICAL MALPRACTICE AND VICARIOUS LIABILITY

(Against Defendants FDC, Julie Jones, Corizon, and CMC)

253. Plaintiff, Mr. Woerner incorporates and re-alleges paragraphs 1 through 197 of this complaint as if fully set forth herein.

254. At all times relevant, the above aforementioned Defendants have acted and will continue to act under the color of state law.

255. Defendants FDC, Jones, Corizon, and CMC are vicariously liable for the deliberately indifferent acts and/or omissions of its employees and/or agents, contractors/sub-contractors, who at all times relevant hereto acted on behalf of Defendants FDC, Jones, Corizon, and CMC and within the scope of their employment, under the doctrines of *respondeat superior* and ostensible agency failing to provide the current Standard of Care necessary for Plaintiff infected with HCV and liver Fibrosis and the Plaintiff's injuries were the direct legal and proximate result of the Defendants' deliberate indifference to Plaintiff's condition, injuries and suffering.

## CONCLUSION

256. Plaintiff Kim Brian Woerner has been suffering from the symptoms of HCV and Fibrosis of the liver, and remains at risk for serious future complications and even death, despite the fact that there is a simple one-pill-a-day cure for this disease. Plaintiff seeks a preliminary

injunction and protective order from the court requiring FDC and all the other Defendants to provide him with the treatment he so desperately needs.

257. Julie Jones in her capacity as Secretary of the Department of Corrections has authority to implement changes to Policy, Protocol, Practice, Procedure and Custom under Fla. Stat. § 20.315. Therefore, Defendant Jones can under her authority implement a portion of the relief sought.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Kim Brian Woerner respectfully requests the following relief for Federal Claims:

A.   Declatory Judgment against all Defendants for their actions, omissions and their full knowledge of the possible consequences involved in the adoption, implementation, administration, and use of the current H.S.B. 15.03.09 Supplement #3 HCV Medical Policy, Protocol, Procedure, Practice and Custom for the treatment of Hepatitis C, which deprived and violated the Plaintiff's Eighth and Fourteenth Amendment right(s), as well as the Americans With Disabilities Act and Rehabilitation Act, to: not undergo cruel and unusual punishment and equal and adequate medical care, of which are guaranteed under the Laws, Acts and Constitution of the United States of America;

B.   Injunctive relief, Temporary, Preliminary, and/or Permanent, Ordering that Florida Department of Corrections and Julie Jones, (a) re-formulate, implement, and administer a Hepatitis C treatment Policy, Protocol, Procedure, Practice and Custom that is equal with and meets the current prevailing Community Standard of Care and remain current within the changes in the prevailing Community Standard of Care set forth by CDC, AASLD, IDSA, and ISA-USA

as expert Medical Authorities with no qualifiers other than being infected with Chronic HCV; (b) that Mr. Woerner be immediately treated with the medically necessary and appropriate direct-acting antiviral drug(s), based upon Mr. Woerner's genotype testing and medical evaluation by a qualified specialist in the field of Liver Disease; (c) that Mr. Woerner receive, after his successful treatment cure is achieved, ongoing monitoring and medical care per the current prevailing Community Standard of Care for Mr. Woerner's level of liver Fibrosis and/or Cirrhosis, also a evaluation/treatment for Liver Cancer (HCC) if present and an evaluation for a partial or full Liver Transplant if deemed necessary by a qualified specialist in the field of liver diseases;

C.     An Order waiving the posting of a bond for security;

D.     A protective Order enjoining Defendant Jones, *et al.* from taking any action to interfere with Plaintiff's right to maintain this action, or from retaliating in any way against Mr. Woerner for bringing this action;

E.     An Order retaining jurisdiction over this matter to ensure that the terms of any injunction are fully and timely implemented;

F.     Damages sought from Defendant(s):

   (1) From **Defendant FDC** in its Official and Supervisory capacity. Total Damages in the amount of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

(2) From **Defendant Julie Jones** in her Official, Supervisory, and Individual capacity, a total of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

(3) From **Defendant Tom Reimers** in his Official, Supervisory, and Individual capacity, a total of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

(4) From **Defendant Michelle Schouest** in his/her Official, Supervisory, Corporate and Individual capacity, a total of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

(5) From **Defendant Corizon, LLC** in their Official, Supervisory, and Corporate capacity, a total of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

(6) From **Defendant Centurion Managed Care of Florida, LLC** in their Official, Supervisory, and Corporate capacity, a total of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

(7) From **Defendant Dr. A. Ladele, DO** in his Official, Supervisory, and Individual capacity, a total of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

(8) From **Defendant C. Haddad, MD** in his Official, Supervisory, and Individual capacity, a total of $800,000: in Punitive Damages: $500,000; In Compensatory Damages: $300,000; and Nominal Damages in the amount the Court feels equitable.

G.     Any other relief this Court may deem equitable and just under the circumstances.

**WHEREFORE,** Plaintiff further respectfully requests the following relief for State Claims:

A.     Declatory Judgment against all Defendants for their actions, omissions and current medical Policy, Protocol, Procedure, Practice and Custom for the treatment of Hepatitis C, which deprived and violated the Plaintiff's rights in Article I Section 17 of the State of Florida's Constitution, as well as by deliberate indifference caused medical malpractice, medical malpractice vicarious liability and *respondeat superior*;

B.     Injunctive Relief, Temporary, Preliminary and/or Permanent, Ordering that Florida Department of Corrections and Julie Jones (a) re-formulate, implement and administer a Hepatitis C treatment; Policy Protocol, Procedure, Practice and Custom that is equal with and meets the current prevailing Community Standard of Care, with no numerical or other set of qualifications other than having Chronic HCV, and remain current with the changes in the prevailing Community Standard of Care set forth by CDC, AASLD, IDSA, and ISA-USA as Expert Medical Authorities; (b) that Mr. Woerner be immediately treated with the medically necessary and appropriate direct-acting antiviral drug(s) based upon Mr. Woerner's genotype testing and medical evaluation by a qualified specialist in the field of Liver Diseases; (c) that Mr. Woerner receive, after his successful treatment cure is achieved, ongoing monitoring and medical care per the current prevailing Community Standard of Care for Mr. Woerner's level of

Fibrosis and/or Cirrhosis, also an evaluation and treatment for Liver Cancer (HCC) if present and an evaluation for a partial or full Liver Transplant if deemed necessary by a qualified specialist in the field of Liver Diseases;

C.    An Order waiving the posting of a bond for security;

D.    A protective Order enjoining Defendant Jones, *et al.* from taking any action to interfere with Plaintiff's right to maintain this action, or from retaliating in any way against Mr. Woerner for bringing this action;

E.    An Order retaining jurisdiction over this matter to ensure that the terms of any injunction are fully and timely implemented;

F.    DAMAGES SOUGHT FROM DEFENDANTS:

(1) From **Defendant FDC** in its Official and Supervisory capacity. Total Damages in the amount of $500,000: In Punitive Damages: $300,000; In Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

(2) From **Defendant Julie Jones** in her Official, Supervisory, and Individual capacity, a total of $500,000: In Punitive Damages: $300,000; In Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

(3) From **Defendant Tom Reimers** in his Official, Supervisory, and Individual capacity, a total of $500,000: In Punitive Damages: $300,000; In Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

(4) From **Defendant Michelle Schouest** in her Official, Supervisory, Corporate and Individual capacity, a total of $500,000: In Punitive Damages: $300,000; In

Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

(5) From **Defendant Corizon, LLC** in their Official, Supervisory, and Corporate capacity, a total of $500,000: In Punitive Damages: $300,000; In Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

(6) From **Defendant CMC** in their Official, Supervisory, and Corporate capacity, a total of $500,000: In Punitive Damages: $300,000; In Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

(7) From **Defendant Dr. A. Ladele, DO** in his Official, Supervisory, and Individual capacity, a total of $500,000: In Punitive Damages: $300,000; In Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

(8) From **Defendant C. Haddad, MD** in his Official, Supervisory, and Individual capacity, a total of $500,000: In Punitive Damages: $300,000; In Compensatory Damages: $200,000 and Nominal Damages in the amount the Court feels equitable.

G.    Any other relief this Court may deem equitable and just under the circumstances.

<u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I Kim Brian Woerner declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 16ᵗʰ day of _February_ , 2018.

Respectfully submitted,

Kim Brian Woerner, *pro se*
D.C. Number: 094168
Avon Park CI-Work Camp
8100 Highway 64 East
Avon Park, Florida 33825-6801